GORSUCH, Circuit Judge,
concurring.
I am pleased to join Judge Kelly’s thoughtful opinion for the court, and write only to add a few thoughts concerning the scope of SORNA’s application.
When interpreting a statute, we begin with the words Congress has chosen. If, taking account of its context, that language is clear, our inquiry ends where it began, and we enforce the statute’s plain meaning. Robinson v. Shell Oil Co., 519 U.S. 337, 340, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997). But if an ambiguity lurks in the statute’s wording, or if the statute’s wording leads to irrational results, we are instructed by the Supreme Court to consult additional interpretive tools, including the statute’s title, its history and purpose, and canons of construction, in an attempt to ascertain and give effect to Congress’s meaning. See, e.g., Exxon Mobil Corp. v. Allapattah Servs. Inc., 545 U.S. 546, 568, 125 S.Ct. 2611, 162 L.Ed.2d 502 (2005); Carter v. United States, 530 U.S. 255, 267, 120 S.Ct. 2159, 147 L.Ed.2d 203 (2000). Applying these instructions, I cannot help but conclude that the statute before us, 42 U.S.C. § 16913(d), is ambiguous, and that, after utilizing our traditional tools for resolving ambiguity, it is beyond question that Congress manifested an intent that SORNA should apply to Mr. Hinckley and others in his situation.
I
In deciding whether a statute is plain or ambiguous, we must ask whether it is “ca *941 pable of being understood in two or more possible senses or ways” by a reasonable and reasonably well-informed reader. Chickasaw Nation v. United States, 534 U.S. 84, 90, 122 S.Ct. 528, 151 L.Ed.2d 474 (2001). In answering this question, we must do so by examining not just “the language itself,” but also “the specific context in which that language is used,” as well as “the broader context of the statute as a whole.” Robinson, 519 U.S. at 341, 117 S.Ct. 843. With that in mind, and because subsection (d) expressly references and interacts with subsection (b), I reprint both provisions:
(b) Initial registration
The sex offender shall initially register—
(1) before completing a sentence of imprisonment with respect to the offense giving rise to the registration requirement; or
(2) not later than 3 business days after being sentenced for that offense, if the sex offender is not sentenced to a term of imprisonment.
* * *
(d) Initial registration of sex offenders unable to comply with subsection (b) of this section[1]
The Attorney General shall have the authority to specify the applicability of the requirements of this subchapter to sex offenders convicted before July 27, 2006 or its implementation in a particular jurisdiction, and to prescribe rules for the registration of any such sex offender and for other categories of sex offenders who are unable to comply with subsection (b) of this section.
It seems to me that a reasonable reader could find the language of subsection (d) susceptible to at least two interpretations. First, it might be read, as Mr. Hinckley, the dissent, and the Eleventh Circuit suggest, as containing two entirely independent commands: (i) SORNA will apply only to those convicted of sex offenses in the future, unless the Attorney General should happen to decide otherwise; and, (ii) the Attorney General is authorized to prescribe rules for the registration of certain sex offenders. See Dissent at 949-50; United States v. Madera, 528 F.3d 852 (11th Cir.2008). Second, as the court and the Eighth Circuit suggest, subsection (d) might be read as embodying a single command: that the Attorney General shall determine the applicability of SORNA and adopt any necessary registration rules for those sex offenders unable to comply with the initial registration requirements of subsection (b). See Majority at 932; United States v. May, 535 F.3d 912, 918-19 (8th Cir.2008). The fact that the first construction is not the only one a reasonable reader could reach is indicated by several features of the statute.
A
The first, and most narrow, such feature lies in the grammar of subsection (d) itself and the lack of clarity about what the phrase “who are unable to comply with subsection (b) of this section” actually modifies. In this respect, our statute is like a veterinarian’s advertisement promising to “perform surgery on any canine under 100 pounds, and provide necessary medication for any such canine and for other canines who are domestic pets.” A reasonable person might understand the *942 first part of the advertisement as standing alone and offering operations on wild coyotes under 100 pounds. But the use of the word “other” — a term that is often used to narrow the scope of terms that precede it — together with the modifying phrase “who are domestic pets” later in the advertisement suggests an additional and quite different possibility: that the vet’s promise to operate on canines under 100 pounds is restricted to pets, to Rover not Wile E. Coyote. The reasonableness of such an interpretation may be enhanced and confirmed if the advertisement appears in the context of a neat suburban vet’s office filled with poodles and lap cats rather than an animal rescue outpost near the wilderness.
So it is with our statute. Because § 16913(d) provides that the Attorney General can specify the applicability of SORNA for those offenders convicted before July 27, 2006 and prescribe rules for those offenders and any other offenders unable to comply with subsection (b), it is at least possible to read the language to suggest that the Attorney General’s power only extends to those offenders convicted before July 27, 2006, who are also unable to comply with subsection (b) — and not to all sex offenders convicted before July 27, 2006. To be sure, statutory context, a point I will turn to shortly, may well shed light on the reasonableness of this reading, and help us ascertain whether an ambiguity exists. But it is not an interpretation that can be necessarily and automatically excluded even by the isolated language of the statute.
To argue otherwise risks having us ignore the reality of ambiguity created by misplaced modifiers and similar grammatical sins in everyday English. Groucho Marx got laughs with his quip, “One morning I shot an elephant in my pajamas. How he got into my pajamas I’ll never know,” precisely because the most grammatical readings are not always the only reasonable ones. Context allows us to know that elephants rarely hide in pajamas and that another reading is at least reasonable and even much more likely. The Supreme Court has repeatedly instructed us that we must take account of just such possibilities in statutory construction, warning that an interpretation can be “literally permit[ted]” by a statute’s grammar, “quite sensible as a matter of grammar,” and even “the most natural grammatical reading” of the statute, without being the only reasonable interpretation, or even the reading most consistent with Congress’s manifest intent. See Chickasaw Nation, 534 U.S. at 90, 122 S.Ct. 528; United States v. X-Citement Video, Inc., 513 U.S. 64, 68-69, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994); Nobelman v. Am. Savings Bank, 508 U.S. 324, 330-331, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993). After all, judges are not charged with grading Congress’s grammar but with applying laws in conformance with Congress’s manifest purpose.
The Court’s decision in X-Citement Video highlights this fact. The statute at issue there covered any person who “knowingly transports or ships in interstate or foreign commerce by any means including by computer or mails, any visual depiction if (A) the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct; and (B) such visual depiction is of such conduct.” 513 U.S. at 68, 115 S.Ct. 464. The question presented to the Court was whether the word “knowingly” modified only the surrounding verbs (i.e., transports and ships) or whether it also modified the phrase “visual depiction involv[ing] the use of a minor engaging in sexually explicit conduct.” Despite conceding that, under the most natural grammatical reading, “knowingly” would only modify the surrounding *943 verbs, the Court explained that Congress could not have intended a result where the only required mens rea of a defendant was that he knew he used the mail, not that the package he mailed contained sexual images of minors. Id. at 69-70, 115 S.Ct. 464.
X-Citement Video shows that the possibility of misplaced modifiers is real and that grammatical heuristics can “assuredly be overcome by other indicia of meaning,” Barnhart v. Thomas, 540 U.S. 20, 26, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003). Accordingly, when presented with a statute with a potential misplaced modifier or clause that might apply to more than just one antecedent, we must consult the surrounding context and structure before reflexively enforcing any construction of the statute. See X-Citement Video, 513 U.S. at 68, 115 S.Ct. 464; Nobelman, 508 U.S. at 331, 113 S.Ct. 2106; see also FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 132, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000) (“The meaning — or ambiguity— of certain words or phrases may only become evident when placed in context.”).[2]
B
Mr. Hinckley (like the dissent) reads subsection (d) in isolation. But just as context helps us ascertain an ambiguity lurking in the vet’s and Marx’s statements, an examination of the context surrounding subsection (d) confirms that Mr. Hinck-ley’s interpretation of the statute is far from the only reasonable one available. In SORNA, Congress expressly stated its intent to establish a “comprehensive” regime for the registration of sex offenders, see 42 U.S.C. § 16901, and virtually every feature of the Act evinces and seeks to further that design. Mr. Hinckley’s interpretation of subsection (d) is irreconcilably at war with that stated purpose and its repeated manifestation throughout the Act, while the court’s interpretation makes sense of and is in harmony with Congress’s direction.
For example, Congress required states with preexisting sex offender registries to meet national standards and prodded states without registries to create them. See 42 U.S.C. §§ 16914(b); 16918; 16919(b); 16922; 16924. Elsewhere in the Act, Congress provided for the creation of a national sex offender registry for use by federal and state investigators nationwide; it also provided for the establishment of a public website allowing citizens to search for sex offenders by zip code. 42 U.S.C. *944 § § 16919 & 16920. Thus, in SORNA Congress sought to build on existing state registries and stitch them into a seamless national network, allowing governmental authorities and the public to access information on sex offenders nationwide.
Still other features of the statute confirm the comprehensive nature of the Act, and its effort to cover existing sex offenders. The term “sex offender” is defined as “an individual who was convicted of a sex offense.” 42 U.S.C. § 16911(1) (emphasis added). The Act thus seems to envision the registry of existing sex offenders, not just those who are convicted after its enactment. And § 16913(a) directs all “sex offender[s]” to register and keep their registration current. No distinction is made between those sex offenders with convictions that predate SORNA and those who are convicted after SORNA. The same is true of § 16913(c), which directs all sex offenders to keep them registration current if they should change their name, residence, employment, or student status. As the Eighth Circuit put it, “[t]he bulk of the statute does not make a distinction between those convicted before the Act and those convicted after. It imposes its requirements on ‘sex offenders’ without qualification.” May, 535 F.3d at 917 (quoting Roberts, 2007 WL 2155750, at *2).
Mr. Hinckley’s reading of subsection (d) would undo Congress’s express and repeatedly indicated purpose. Absent some action by the Attorney General, those convicted before its enactment would never have to register. Quite literally, a sex offender convicted one day before SOR-NA’s enactment on July 26, 2006 of raping a child, and who thereafter serves twenty years’ imprisonment, would have no obligation to register for the rest of his or her life, even after• leaving prison in 2026. Under Mr. Hinckley’s reading, then, it might well be the late 21 st century before all sex offenders must register. The databases SORNA created for the public and law enforcement would sit idle, taking decades to be of any meaningful value. Such a regime would be better described as cursory than comprehensive.
While Mr. Hinckley’s interpretation does not make sense in light of the statute’s context, the court’s interpretation does. Prior to SORNA, some states did not have sex offender registration requirements as broad as SORNA’s; others had no registries at all. As a result, some individuals who are classified as sex offenders under SORNA were not previously required or able to register under state law. See United States v. Hinen, 487 F.Supp.2d 747, 751-52 (WD.Va.2007). Aware that these individuals, through no fault of their own, could not initially register under subsection (b), which requires initial registration before an offender completes his or her prison sentence or 3 days after being sentenced to probation, Congress had to make provision for the registration of such sex offenders. The court’s reading is entirely consistent with this necessity. It reads subsection (d) simply (but significantly) as authorizing the Attorney General to determine whether and how to provide for the registration of those sex offenders — not as suggesting a massive additional limitation on the Act’s compass. As the court in Roberts explained, “it is clear from the context” of the statute as a whole “that [Congress’s] intent was not to exempt all sex offenders convicted before July 2006 from registration requirements, but rather to avoid the obvious injustice of requiring such offenders to do the impossible of registering within 3 days of their years-old convictions.” 2007 WL 2155750 at *2.[3]
*945 c
Finally, and related to the last point, ambiguity is suggested by the absurd results that Mr. Hinckley’s reading produces. See Lamie v. U.S. Trustee, 540 U.S. 526, 536, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004) (acknowledging that if plain meaning leads to absurd results, court may be required to treat the text as ambiguous).[4]
First and most obviously, Mr. Hinckley’s reading of subsection (d) requires us to believe that Congress sought simultaneously to achieve two manifestly irreconcilable ends: (1) to create a “comprehensive national system” for the registration of sex offenders, 42 U.S.C. § 16901, and (2) to exempt all existing sex offenders from that comprehensive system. That makes nonsense of the word “comprehensive,” unless Congress’s purpose was to create a comprehensive registration regime for 22nd century sex offenders rather than those of our own time. Certainly, it is no less absurd to think Congress intended such a result than to surmise it wished, as in X-Citement Video, to criminalize the knowing use of the mails without requiring that the defendant have any knowledge that the item mailed contained child pornography.
Beyond that most glaring absurd result, other problems emerge under Mr. Hinck-ley’s reading of § 16913(d) but not the court’s interpretation. By way of example, under Mr. Hinckley’s reading the Attorney General is given the power to specify whether SORNA applies and to prescribe registration rules for all past offenders, not just those unable to comply with subsection (b). See Dissent at 949-50. That is, the Attorney General is given the power to prescribe registration rules for, and even determine whether SORNA should apply to, past offenders who were already registered under SORNA-compliant state registration regimes before SORNA’s passage and thus already automatically in compliance with the federal Act.[5] But why would *946 the Attorney General be permitted or need to prescribe rules for the registration of individuals already registered? Or, even more oddly, to decide, in his discretion, whether such individuals should be subject to the Act at all? Such a power would serve no obvious purpose, and is supported by no conceivable justification. Likewise, the Attorney General would have the same extensive power for those past offenders— like Mr. Hinckley — who could have initially registered before SORNA’s passage through an existing SORNA-complaint state registration system but who failed to do so. Again, there is no plausible need or reason to delegate to the Attorney General such authority with respect to individuals who were perfectly capable of registering as required by state law.[6]
II
Given all of these problems — the uncertainty regarding the meaning of subsection (d) even when viewed in isolation, the outright conflict between Mr. Hinckley’s preferred interpretation of that subsection and virtually every other facet of the Act, and the absurd results his interpretation compels — I cannot subscribe to the view that his interpretation is, plainly, the only reasonable reading of the Act. Because § 16913(d) is ambiguous, we are directed to employ traditional tools of statutory interpretation in an effort to discern Congress’s meaning. Doing so readily and definitively resolves the ambiguity against Mr. Hinckley.
A
"While precedent precludes reference to a statute’s title when deciding whether the language of the statute itself is ambiguous, once ambiguity is found the title may be employed to shed light on Congress’s intention. Carter, 530 U.S. at 267, 120 S.Ct. 2159; see also supra n. 1. Here, the title of § 16913(d) makes Congress’s purpose blindingly clear. Section 16913(d) is titled “Initial registration of sex offenders unable to comply with subsection (b) of this section.” This title’s reference to sex offenders unable to comply with subsection (b) suggests that everything within the subsection concerns that limited group of offenders. All other sex offenders — those *947 who were able to initially register under state law prior to SORNA, a group that includes Mr. Hinckley — are not covered by § 16913(d), and are unambiguously directed to register and keep their registration current under §§ 16913(a) and (c).
B
Lest any doubt remain, subsection (d)’s meaning is confirmed by the Act’s structure and history. Without repeating the structural arguments in Part I.B supra, each underscores that Congress sought a comprehensive regime with meaningful application in today’s world, not in some far distant age, and thus that the problem Congress sought to address in subsection (d) was how to handle the narrow issue of registration for those unable to initially register in compliance with § 16913(b). By contrast, nothing in the Act suggests that Congress sought to allow the Attorney General to decide whether or not the law would have comprehensive effect. Mr. Hinckley points to no such indicia in the Act’s structure, and neither have we located any.
The Act’s legislative history confirms the point. Though the Supreme Court has recognized that legislative history is “often murky, ambiguous, and contradictory,” Exxon Mobil Corp., 545 U.S. at 568, 125 S.Ct. 2611, the Court itself has repeatedly told us to employ such history when seeking to resolve an ambiguous text, see, e.g., Green v. Bock Laundry Mach. Co., 490 U.S. 504, 508-09, 109 S.Ct. 1981, 104 L.Ed.2d 557 (1989). And, happily, the legislative history in this case is neither murky, ambiguous, nor contradictory. While Judge Harold Leventhal famously once compared arguments from legislative history to “entering a crowded cocktail party and looking over the heads of the guests for one’s friends,” Conroy v. Aniskoff, 507 U.S. 511, 519, 113 S.Ct. 1562, 123 L.Ed.2d 229 (1993) (Scalia, J., concurring), the legislative history before us is, in Judge Leventhal’s vernacular, like a cocktail party where only friends are in attendance. That is, the bill’s sponsors consistently and emphatically expressed displeasure with the existing state-by-state patchwork of sex offender laws and stated their intention to replace them with a uniform, comprehensive federal registration statute. 152 Cong. Rec. S8012, 8012-31 (July 20, 2006); 152 Cong. Rec. H5705, 5722-5731 (July 25, 2006). The bill’s sponsors also expressly sought for the new centralized regime to cover the approximately 500,000 sex offenders registered under various and patchwork state regimes at the time of the bill’s enactment, as well as the estimated 100,000 entirely unregistered and unaccounted for offenders.[7] Given these statements, it beggars credulity to think that SORNA might have been intended by the authors of the legislation to exempt from registration every single sex offender at the time of its enactment.
*948 C
Two additional factors counseling in favor of the interpretation of § 16913(d) offered by the court are the Supreme Court’s teachings to avoid interpretations that produce absurd results or constitutional problems. I’ve already explained and won’t repeat here why Mr. Hinckley’s interpretation risks the absurd result of converting a comprehensive regime into a cursory one. See supra Part I.C. But, I will pause briefly to discuss the potential constitutional difficulty raised by Mr. Hinckley’s interpretation.
Article I of the Constitution vests legislative authority in Congress and “permits no delegation of those powers.” Whitman v. Am. Trucking Assocs., 531 U.S. 457, 472, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001). That is why, when Congress delegates authority to the executive branch, the Supreme Court requires it to provide “an intelligible principle to which the person or body authorized to [act] is directed to conform.” Id. (quoting J.W. Hampton Jr., & Co. v. United States, 276 U.S. 394, 409, 48 S.Ct. 348, 72 L.Ed. 624 (1928)). Under Mr. Hinckley’s reading, however, the Attorney General has, as the Eleventh Circuit conceded, “unfettered discretion to determine both how and whether SORNA [is] to be retroactively applied.” Madera, 528 F.3d at 858 (first emphasis added). Without any discernible principle to guide him or her in the statute, the Attorney General could, willy nilly, a) require every single one of the estimated half million sex offenders in the nation to register under SORNA, b) through inaction, leave each of those half million offenders exempt from SORNA, c) do anything in between those two extremes, or d) change his or her mind on this question, making the statute variously prospective and retroactive, as administrative agencies are normally entitled to do when Congress delegates interpretive questions to them, see Nat’l Cable & Tel. Ass’n v. Brand X Internet Servs., 545 U.S. 967, 1001, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005). The Supreme Court tells us that we ought to construe statutes to avoid problems of potential constitutional dimension when a plausible alternative interpretation exists. See Indus. Union Dept. AFL-CIO v. Amer. Petroleum Inst., 448 U.S. 607, 646, 100 S.Ct. 2844, 65 L.Ed.2d 1010 (1980) (suggesting that statutes should be construed to avoid a “sweeping delegation of legislative power” that might be unconstitutional). And plainly a reasonable alternative exists in this case far more consonant with every indicator of congressional intent.[8]
*949 * * *
Mr. Hinckley’s interpretation is not without some grammatical appeal. But neither is it the only parsing of subsection (d) a reasonable reader might make. Nor are we permitted by the Supreme Court to interpret isolated statutory phrases solely according to grammatical diagrams. We must take account of Congress’s grammar to be sure, but the Court also requires us to take account of surrounding text, structure, and context. Following these directions with respect to our interpretive role, I am convinced that SORNA applies to Mr. Hinckley. I concur.

. To read the title of this subsection is to settle conclusively the debate over congressional intent. But we are instructed not to consider statutory titles unless ambiguity in the statute’s meaning first appears, Carter, 530 U.S. at 267, 120 S.Ct. 2159, so we will pretend for the moment that we did not see it.

. An analogy advanced by the dissent serves to underscore the point. A statute applying to "humans and to other categories of primates who walk on two legs,” Dissent at 951, surely could be read to suggest two distinct categories (humans and other primates who walk on two legs). But it is hardly beyond the linguistic pale to think that the modifying phrase "who walk on two legs” could restrict the term "humans” to those humans who walk on two legs. Of course, whether such a reading is reasonable could depend on the context of the statute as a whole, as Robinson instructs and Marx illustrates. Does other language in the statute indicate that Congress was regulating conduct that can only be performed by upright walkers? Or does such other language indicate Congress was regulating a subject more generally applicable to humans and two-legged primates? The plainness or ambiguity of a statute depends not just on the grammar of the single isolated sentence but, again, on “the context in which that language is used, and the broader context of the statute as a whole.” Robinson, 519 U.S. at 341, 117 S.Ct. 843. Curiously, the dissent says it's easy to know my canine advertisement analogy doesn't cover coyotes because that would be an absurd result given the context. Dissent at 950, n. 2. But the dissent doesn’t proceed to explain why its own reading of the statute isn’t subject to the same critique: it is no less implausible that Congress would give the Attorney General unfettered, unguided discretion to decide the scope of a criminal law in the context of an avowedly "comprehensive” regime. See infra Parts I.B & C.

. The dissent claims that its interpretation is neither “irrational [n]or counterproductive” *945 because “SORNA's registration requirement applies to all sex offenders, whether their offense was committed before or after the effective date.” Dissent at 950. This assertion is simply mistaken. Under the interpretation adopted by the dissent, the registration requirement of SORNA presumptively applies only to future sex offenders. It is merely if the Attorney General happens to choose, in his or her unfettered discretion and at some unspecified future time or in some future age, to rule otherwise that the Act has any application to existing sex offenders. For reasons I’ve given, such a construction of the statute is inconsistent with its manifest intent to create a comprehensive registration regime.
Alternatively, the dissent argues that interpreting the statute to exempt all past offenders is no more inconsistent with SORNA's comprehensive scheme than this court’s holding in United States v. Husted, 545 F.3d 1240 (10th Cir.2008), that a sex offender must travel in interstate commerce after SORNA’s effective date to be criminally convicted of failing to register. This too is not so. The requirement that an offender travel in interstate commerce after the Act’s effective date is plainly designed to ensure consistency with the Constitution — both with respect to Congress's power to legislate under the Commerce Clause as well as the prohibition against ex post facto laws. Congress desired SORNA to be both comprehensive and constitutional. Husted sensibly interprets one section of SORNA in conformity with those joint goals. In contrast, the dissent’s interpretation of subsection (d) robs SORNA of its comprehensive nature.

. In fact, the Supreme Court has previously suggested that it will not interpret a statute to produce an absurd result even if the statute’s language is un ambiguous. See, e.g., Hartford Underwriters Ins. Co. v. Union Planters Bank, 530 U.S. 1, 6, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000); see also United States v. Brown, 333 U.S. 18, 68 S.Ct. 376, 92 L.Ed. 442 (1948).

. See United States v. Gagnon, 574 F.Supp.2d 172, 176 (D.Me.2008) (explaining that because sex offender was already registered un *946 der state law when SORNA was passed, his only obligation was to keep his registration current); United States v. Roberts, 2007 WL 2155750, at *2 (W.D.Va.2007) (same).

. The Attorney General himself has discussed many of these problems and likewise concluded that subsection (d) is ambiguous and best understood as applying to all sex offenders even in the absence of any action by him. See Applicability of the Sex Offender Registration and Notification Act, 72 Fed.Reg. 8894, 8896. Whether or not the Attorney General’s determination is entitled to deference in the quasi-criminal, quasi-regulatory context of assessing the scope of the registration requirement, see, e.g., Gonzales v. Oregon, 546 U.S. 243, 258-59, 126 S.Ct. 904, 163 L.Ed.2d 748 (2006) (considering whether to afford deference to Attorney General’s classification of drugs used for assisted suicide, a classification that could lead to criminal prosecutions), I need not resolve; it is notable in any event for its persuasive force. Of course, the Attorney General went on to promulgate an interim rule stating that SORNA applies “to all sex offenders, including sex offenders convicted of the offense for which registration is required prior to the enactment of that Act.” 28 C.F.R. § 72.3. In Madera, the Eleventh Circuit found that this statement supported its conclusion that the Attorney General has the power to determine whether SORNA applied to those convicted before its enactment. 528 F.3d at 858. But I respectfully submit that the Eleventh Circuit drew the wrong conclusion. In addition to the fact that the Attorney General explicitly read the Act to apply to all sex offenders even in the absence of his action, the Attorney General also made clear that he was issuing the Interim Rule only to “foreclose” prior offenders from arguing that SORNA did not apply to them because the Attorney General had not acted. 72 Fed.Reg. 8894, 8896.

. Senator Biden said, "[TJhere are over 550,-000 offenders nationwide, and more than 20 percent of them are unaccounted for.... [Tjhis means there are as many as 150,000 of these dangerous sex offenders out there, individuals who have already committed crimes and may, unless we do something, continue to jeopardize the most vulnerable among us.” 152 Cong. Rec. S8012, 8014. See also 152 Cong. Rec. H5705, 5722 (Rep. Sensenbrenner: "There are over a half million sex offenders in the United States and up to 100,000 offenders are unregistered and their locations [are] unknown to the public and law enforcement.”). Senator Hatch added that "[l]aws regarding registration for sex offenders have not been consistent from State to State[;] now all States will lock arms and present a unified front in the battle to protect children.” 152 Cong. Rec. S8012, 8013 (daily ed. July 20, 2006).

. Because, after consideration of the "text, structure, and history" of SORNA, "the Government’s position is unambiguously correct,” United States v. Granderson, 511 U.S. 39, 54, 114 S.Ct. 1259, 127 L.Ed.2d 611 (1994), the rule of lenity has no application. The rule of lenity applies only if, after "seizing every thing from which aid can be derived,” Smith v. United States, 508 U.S. 223, 240, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993) (quoting United States v. Bass, 404 U.S. 336, 347, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971)), including the structure and history of the Act and relevant statutory titles, United States v. Godin, 534 F.3d 51, 60 (1st Cir.2008); United States v. Villanueva-Sotelo, 515 F.3d 1234, 1247 (D.C.Cir.2008); United States v. Marek, 238 F.3d 310, 322-23 (5th Cir.2001), the statute remains ambiguous. That isn't the case here. Neither is the basic purpose of the lenity canon applicable. Mr. Hinckley had "fair warning,” Bass, 404 U.S. at 347-48, 92 S.Ct. 515, of his registration obligations because they are prescribed by state law, and SORNA did not expand them. See Majority at 938-39. The statutory canon against retroactivity likewise could not come into play, given the clarity of Congress’s intent after consideration of the Act’s context, structure, and history. See Landgraf v. USI Film Prods., 511 U.S. 244, 262-63, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) (examining legislative history to determine whether Congress clearly intended for statute to apply retroactively). Indeed, it is highly unlikely that § 16913(d) could trigger *949 the canon against retroactivity in any event. While the statute applies to those with past convictions, it penalizes individuals only for prospective conduct — if they fail to register and travel in interstate commerce after the effective date of the Act. See Husted, 545 F.3d at *1247.